IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 17, 2005 Session

## STATE OF TENNESSEE v. SARAH MARTIN

**Appeal from the Criminal Court for Knox County**
**No. 74749     Mary Beth Leibowitz, Judge**

---

**No. E2004-01972-CCA-R3-CD - Filed October 21, 2005**

---

The defendant was convicted following a jury trial in Knox County for arson and aggravated burglary, as charged.  The trial court sentenced the defendant six (6) months confinement and five (5) years and (6) months on probation to be followed by a second six (6) year sentence to be served entirely on probation.  The defendant argues three (3) issues on appeal: (1) the evidence was insufficient to support her convictions; (2) the trial court erred in allowing testimony at trial contrary to the defendant's motion in limine which was granted by the trial court; and (3) the defendant's sentence was imposed contrary to Blakely v. Washington, 542 U.S. ----, 124 S.Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S. 466 (2000).  After a careful review of the record, we affirm the defendant's convictions and remand for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Kelly S. Johnson, Knoxville, Tennessee, for the appellant, Sarah Martin.

Paul G. Summers, Attorney General & Reporter; Blind Akrawi, Assistant Attorney General; Randall E. Nichols, District Attorney General; Kevin Allen, Assistant District Attorneys General, for the appellant, State of Tennessee.

# OPINION

## Factual Background

In October of 2001, Ricky Meredith, the victim, went to Chicago to appear on the Jerry Springer show. He was accompanied by his soon to be ex-wife Donna Martin, who is also the mother of Sarah Martin, defendant. Before he left, he repeatedly asked his landlord to fix the lock on the window in the bathroom of his apartment. The lock was broken and the bathroom window could not be locked. He left on a Tuesday and came back on Thursday. The victim returned from Chicago to find that his apartment had been badly damaged in a fire. The fire destroyed his new couch. The walls were completely black and had a very bad odor. In addition to the damage from the fire, several items were missing from Meredith's apartment. Among the items missing were movies, a television, a cable box, clothing, and two (2) pairs of barber clippers.

The proof showed that Jason Copley, and the defendant were living together at the time of the fire. Copley and the defendant were involved in an altercation with some people down the street. Due to this altercation, Copley and the defendant decided they needed a gun. Because neither of them had any money to buy a gun, they eventually went to Mr. Meredith's house to steal one. The doors were all locked, so they began trying the windows, and were able to push in a plexiglass window in the bathroom. They got a chair off the front porch and Copley lifted the defendant through the window into the apartment. The defendant went to the door and admitted Copley. Once inside, the pair began looking for guns, but were unsuccessful. Copley and the defendant wore socks on their hands while searching Meredith's house until they found some gloves in a drawer. They did find some ammunition. When they were unable to find any weapons, the couple began to collect other items to take such as a 19 inch color TV, new clothing, a new electric blanket, and brand new hair clippers still in the box. They put these items into four (4) black plastic bags and Copley took these bags to the car. While Copley was taking the bags to the car, the defendant began setting fires in the house. She set fires in two closets, on the bed and in the kitchen. She did not use gasoline, but did pour something in the kitchen. She also put ammunition in the oven. After they got all the items they wanted out of the house, at the defendant's suggestion, the couple set the victim's couch on fire. According to Copley, defendant became sexually aroused by the fire. She was "bumping around and rubbing . . . on her vagina." So, they drove to an empty parking lot across the street and watched the apartment burn. They also heard the ammunition go off in the oven. After watching the fire, Copley and the defendant took the items stolen from the victim to Mr. Copley's parents' house. Copley told Copley's parents that they had found the items at a Goodwill drop-off. However, the parents did not believe him and told him to take the items out of their house. So, the defendant and Copley hid everything in Copley's bedroom. These items were eventually discovered in Copley's half-brother's house, but Copley stated that he did not take them there. Copley was charged with arson and burglary. He pled guilty to arson and the aggravated burglary charge was dropped in exchange for his testimony against he defendant. At the time of the incident, Copley was on probation for a guilty plea to facilitation of attempted especially aggravated robbery.

Copley father, Kenneth Copley, testified that he saw the defendant and his son at his house on the morning of October 24, 2001. The defendant and Copley came in the house carrying "a whole bunch of stuff." The couple told Mr. Copley that they retrieved the items from a Goodwill drop box. Copley's father did not believe their story because the blue jeans they carried had obviously not been worn and still had the tags on them. The defendant and Copley then told Mr. Copley that the items belonged to the defendant and she had just been evicted.

Copley's mother, Vickie Copley, testified that she saw the defendant and Copley in her home between 5:30 a.m. and 7:00 a.m. the morning of October 24, 2001. She saw Copley and the defendant carrying numerous items of personal property they claimed they got out of a Goodwill box. She did not believe their story and told them to get the property out of her house. Ms. Copley also stated that she later had a conversation with the defendant in which the defendant admitted to her that she and Copley broke into Meredith's apartment, stole personal property, and set the apartment on fire. The defendant also told Ms. Copley that it was something to do and that the defendant got off on doing things like that.

A Knoxville police officer who assisted the Knoxville Fire Department Arson Investigators testified that he was investigating the Meredith fire. He interviewed the suspects and their families. He was led to Copley and the defendant because the investigators found Copley's fingerprint at the scene and he received some incriminating statements from Copley's mother and from the defendant's mother. A captain with the Knoxville Fire Department Arson Investigators also testified. He stated that the investigators determined that the fire was indeed arson.

The defendant testified at the trial. She denied any involvement with breaking into the victim's house, stealing the victim's belongings or setting the victim's house on fire. She stated that she was alone the night of the fire. Copley had been at her house that evening and left by 6:00 p.m. and returned around 2:00 or 3:00. Another arson investigator also testified as a witness for the defendant. He stated that when the defendant was a suspect for the fire he had interviewed her. He used some unorthodox methods in his discussions with her and was suspended as a result.

On April 25, 2002, the defendant was indicted by the Knox County Grand Jury for arson and aggravated burglary. A jury trial was held on April 19-20, 2004. The jury found the defendant guilty of both charges. The trial court held a sentencing hearing on May 28, 2005. The trial court sentenced the defendant to six (6) years as a Standard Offender at thirty percent (30%), to be served on split confinement with five (5) years and six (6) months on probation and six (6) months in the Knox County Jail for arson, and six (6) years on probation for aggravated burglary. The defendant was to serve her six (6) months in jail followed by five (5) years and six (6) months on probation for her arson conviction. At the conclusion of the service of her six (6) year sentence for arson, the trial court ordered that the defendant's second six (6) year sentence for aggravated burglary begin. This six (6) year sentence was to be served on probation in its entirety.

## ANALYSIS

The defendant argues three (3) issues on her appeal: (1) whether the evidence was sufficient to support the defendant's convictions of arson and aggravated burglary; (2) whether the defendant was denied a fair trial when state witnesses alluded to uncharged criminal acts during their testimony; and (3) whether the sentence imposed violates the defendant's rights under the Sixth Amendment to the United States Constitution.

### Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

We conclude that when the evidence is viewed in a light most favorable to the State, there is sufficient evidence to support the jury's verdict of guilt. There were several witnesses at the trial. Copley testified that the defendant participated in stealing Meredith's belongings and in setting the apartment on fire. The defendant admitted this to Copley's mother. Copley's testimony, as well as that of his parents, showed that Copley and the defendant were in joint possession of the goods. The defendant was the only witness whose testimony was contrary to that of Copley's and his parents. Her testimony was obviously deemed not credible by the jury and was also not corroborated by any witnesses. As we stated above, it is the province of the trier of fact to determine the credibility of witnesses. In this case, the jury obviously did not believe the testimony of the defendant.

This issue is without merit.

## Violations of Motion in Limine

The defendant's next issue deals with a motion in limine that she filed prior to trial. The motion stated:

> Comes the Defendant, Sarah Martin, by and through counsel of record, and moves this Honorable Court to instruct the District Attorney General, his staff, and/or any of the State's witnesses in this cause not to allude to, refer to, or in any way bring before the jury, whether as a panel or a jury selected to try this cause, any reference to other uncharged alleged criminal activity of any witness who may be called by the State to testify in this matter and/or the Defendant, Sarah Martin.

> Further, Ms. Martin moves this Honorable Court to instruct the District Attorney General, his staff, and/or any of the State's witnesses in this cause not to allude to, refer to, or in any way bring before the jury, whether as a panel or a jury selected to try this cause, any reference to other suspected arson fires or investigation that may have been taking place in and around Knoxville, Tennessee in late 2001 and early 2002.

> Ms. Martin avers that to allow such testimony making any reference to the above listed details would be highly prejudicial to the [sic] Ms. Martin's rights in this cause and a violation of the Constitution and laws of the United States and a violation of the Constitution and laws of the State of Tennessee.

> Ms. Martin further moves this Honorable Court to instruct the District Attorney, his staff, and/or any of the State's witnesses in this cause not to refer to, or allude to such matters related to any reference to the details listed above without first approaching the bench and making known to the Court and the attorney for Ms. Martin, out side the presence and hearing of the jury, that he intends to offer such proof, thus permitting the jury to be retired and the evidence and objections heard, and the Court to rule on the admissibility of such evidence, before it is placed before the jury, thus preventing prejudicial error no subsequent instruction could cure.

Apparently, there was a spate of fires in the same area of Knoxville as where the Meredith fire occurred. The defendant was indicted only for the Meredith fire, but was a suspect in the other fires. The defendant obviously wanted to prevent any mention of the other fires by the witnesses at trial. The trial court granted the defendant's motion in limine.

The defendant argues in her brief, "all three witnesses were under the control of the State and should have been properly instructed regarding their testimony by the District Attorney and his staff to abide by the trial court's ruling as to Ms. Martin's 'Motion in Limine # 2' and thus Ms. Martin was denied a fair trial." One of the witnesses at issue was a witness who was a fireman and was called by the defendant. The State, therefore, argues that the witnesses were not necessarily under the State's control. We believe the issue resolves itself into whether there was prosecutorial misconduct with respect to the violations of the motion in limine.

The law in Tennessee is unclear as to when a violation of a motion in limine constitutes prosecutorial misconduct. However, it does appear in both the Federal system and other jurisdictions that the prosecutor has a responsibility to ensure that witnesses called by the prosecutor follow the guidelines set out by the trial court when it grants a motion in limine. See United States v. Talley, 194 F.3d 758, 762-64 (6th Cir. 1999); Mazo v. State, 481 S.E.2d 831, 832-33 (Ga. Ct. App. 1997); Banks v. State, 955 S.W.2d 116, 119 (Tex. App. 1997). When a violation does occur, often the violation is considered cured by a curative instruction. See Talley, 194 F.3d at 764; United State v. Aichele, 941 F.2d 761 765 (9th Cir. 1991); People v. Hall, 743 N.E.2d 521, 342 (Ill. 2000). We do point out that once a trial court has ruled on a motion in limine, the defendant is not required to object contemporaneously to any potential violation at trial. State v. Brobeck, 751 S.W.2d 828 (Tenn. 1988) (citing Goines v. State, 572 S.W.2d 644 (Tenn. 1978) and State v. McGhee, 746 S.W.2d 460 (Tenn. 1988)). When reviewing allegations of prosecutorial misconduct, "[t]he general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (Tenn.1965); see also State v. Richardson, 995 S.W.2d 119, 127 (Tenn. Crim. App. 1998). The factors relevant to the court's determination are:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
2. The curative measures undertaken by the court and the prosecution.
3. The intent of the prosecutor in making the improper statement.
4. The cumulative effect of the improper conduct and any other errors in the record.
5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App.1976); see also State v. Francis, 669 S.W.2d 85, 91 (Tenn 1984). We now analyze each violation in turn to determine if prosecutorial misconduct occurred.

**Pete Franzen**

The State's first witness was Officer Pete Franzen who is with the City of Knoxville Police Department. The following exchange occurred on direct examination:

Q.     Okay.  Can you describe how you got involved in the case?

A.     Yes sir.  Basically, [the Knoxville Fire Department] had a number of fires that they were looking at and one of them was the Burwell fire.  Basically, I was assigned over there to help them investigate the various fires.  Help them out with witness interviews, suspect information, that kind of thing.

At this point, the defendant's counsel asked to approach the bench.  The trial court and the two (2) attorneys had a conversation concerning the mention of the other fires.  At the conclusion of the discussion the State's attorney stated that he believed he could "reign it back in."  The trial court apparently agreed.  The transcript states that the trial court's comments were inaudible at the conclusion of the bench conference.  The trial court gave no curative instruction, nor did the defendant request one.  The State's attorney resumed the direct examination and asked the witness specifically about the Burwell fire, for which the defendant was indicted.

In the defendant's motion in limine, she asked the trial court to rule that no reference be made to "other suspected arson fires or investigation."  Mr. Franzen's testimony refers to the fact that there were several fires in a short period of time.  The trial court immediately spoke with both the defendant's attorney and the State's attorney and all agreed that the State's attorney would ask questions in such a way to restrict the testimony to the Burwell fire.

Under  the Judge factors, we conclude that this violation of the motion in limine did not constitute prosecutorial misconduct that affected the verdict to the prejudice of the defendant.  The first factor is the conduct complained of viewed in context and in light of the facts and circumstances of the case.  The State's conduct is not egregious in this situation.  While we believe that the prosecutor did not intend for the witness to testify regarding the other fires, it appears that there was some inadequacy  in the prosecutor's instruction to the witness regarding the motion in limine.  When the prosecutor's behavior is taken as a whole, the question which elicited the testimony was one of only two incidents.  The second factor is the curative measures taken by the trial court and the prosecution.  The trial court did not give a curative instruction to the jury.  However, the prosecutor stated that he would "reign it back in," and proceeded to specifically question the witness about the fire that was the subject of the indictment.  The prosecutor made a concerted effort to keep the witness's testimony restrained to the fire at issue.  The third factor, the intent of the prosecutor in making the improper statement has been alluded to above.  There is no evidence from the record that the prosecutor was attempting to get in information concerning the other fires.  The fourth factor is the cumulative effect of the improper conduct and any other errors in the record.  As we stated above, there were two other violations of the motion in limine.  In the two instances that occurred with the State's witnesses the other fires were mentioned.  A third violation occurred during the testimony of one of the defendant's witnesses.  Only two instances occurred with the State's witnesses. We believe the cumulative effect of these violations was not prejudicial in view of  the relative strength of the State's case.  As we stated above, there was more than sufficient evidence

to convict the defendant. Her accomplice in setting this fire and stealing the victim's personal property testified regarding the defendant's participation. His testimony was corroborated by other witnesses at trial. We conclude that the evidence presented at trial led to a strong case against the defendant. Therefore, we find no prosecutorial misconduct with respect to Officer Franzen.

## **Vickie Copley**

Vickie Copley is Copley's mother. She testified that her son and the defendant brought a large amount of personal property to her house the morning of the fire in question. The following exchange occurred on direct examination:

> Q.     Okay. I'd like to talk you [sic] about conversations you might have had with Sarah – did you ever have a chance to talk with Sarah after the night of the fire?
> A.     Yes, I've talked to her.
> Q.     And in those conversations, did you ever talk to her about what happened that night?
> A.     The night they – when they brought all the things to my house?
> Q.     Yes.
> A.     She said that her mother and her mother's two boyfriends had gone to Chicago for the Jerry Springer show and they had went over to – I don't know if it was Rick or the other guy – went over to his house and broke in and took all that stuff that they had brought to my house. And then set the house on – she set the house on fire.
> Q.     Why did she tell you this? What was the context of the conversation?
> A.     Well, I asked her about if she had seen all the fires that they were having on TV –
> [The defendant's attorney]:     Objection, Judge.
> The Court:     Well, I think he's – let's confine ourselves to the issue that we have here today.
> . . . .
> The Court:     I'm going to ask you to ask a specific question with regard to –
> . . . .
> The Court:     – that conversation or what happened on that day.

On redirect, the State's attorney asked whether her son, Copley, was in jail at the time the fire investigators spoke with her. The following exchange occurred:

> A.     I think – I thought he was, but no, I don't think he was because they showed me a map where they were following him and Sarah to different places.

[Defendant's counsel]:        Judge –

The Court:      I don't –

A.        And I don't think he was locked up at that time because they were following him.

The Court:      Okay.


At the conclusion of the State's proof, the defendant moved for a mistrial based on Vickie Copley's testimony. The trial court denied the defendant's motion. The trial court made the following statement:


> Okay. For the purposes of a mistrial and the motion for mistrial, there must manifest [sic] necessity. The door got cracked open yesterday and the Court made a ruling that there would be no discussion of other fires being modis [sic] operandi, if you will, of Ms. Martin, for the purpose to keep this limited to the issues of October the 24th of 2001. Today, on cross examination[1] when Ms. Copley was asked about the issue of when she spoke to the investigators, and she was asked several times by you, she finally indicated and put into context that she believed they were not in jail – that Jason was not in jail because they were following him and Ms. Martin and they had a map of the places that they had been. That's what she said. She didn't say where they set fires. She said, "the places they had been."
>
> Upon redirect, when Mr. Busch asked her again, she basically said the same thing. I don't think that we've cracked the door open to the point where the jury has even – I think it was – if she used the word fire or fires, I don't think we've directed her to other fires. I don't think that that's the impression that the jury has. I don't think that I should give a curative instruction. Because I think it will draw attention to an issue that I think we've already discussed. So I'm not going to declare a mistrial, but I'm going to instruct counsel that in argument and in further questioning, obviously, you may not address this issue of any other activities.


(footnote added). Defendant's counsel then reiterated that they did not wish for a curative instruction by the trial court.

---

[1] The trial court stated this exchange occurred during cross-examination. However, this exchange actually occurred during the State's redirect examination.

Once again, under the <u>Judge</u> factors, we conclude that the alleged prosecutorial misconduct did not affect the verdict to the prejudice of the defendant. As we stated above, we find the prosecutor's conduct was not so egregious ss to require a new trial. Perhaps this witness, as well as Officer Franzen, might have been better prepared with respect to the trial court's order in limine, but this is not a situation where the prosecutor was repeatedly trying to elicit the testimony prohibited by the order in limine. With this particular violation, the trial court did not give a curative instruction. The trial court did tell the prosecutor and the witness that the testimony needed to stay on point. In addition, the record shows that the defendant's attorney repeatedly stated that he did not want the trial court to give a curative instruction. We also do not believe that the prosecutor intended to elicit this testimony and present it to the jury. The cumulative effect of the errors, as noted above, is not overwhelming. There was a great deal of testimony at this trial, and the isolated statements from Officer Franzen and Ms. Copley comprised but a small amount of the testimony. As for the final factor, again as noted earlier, the evidence presented at trial was very strong. Therefore, we believe the violations of the order in limine with this witness did not affect the verdict of the jury to the prejudice of the defendant.

### Doug Connard

The defendant also argues that the testimony of Doug Connard, a captain with the Knoxville Fire Department, violated the order in limine. This witness was actually subpoenaed by the defendant. On direct examination by the defendant's counsel the following exchange occurred:

Q.    So you had some involvement in this investigation in that you were at least interviewing –
A.    Well I tell you –
Q.    –Ms. Sarah Martin?

A.    –what my involvement was actually was Captain Stookesbury and they had – KPD had sent the – that had sent Pete Franzen, Officer Franzen. They had sent Scott Graham, and they had sent a sergeant – and I can't recall his name. And Matt Cook. They had sent all those over there to help us out in this investigation of not just this fire, we had a bunch of fires that weekend after this fire. So they had sent them over there to help us out in this investigation of not just this fire, we had a bunch of fires that weekend after this fire. So they had sent them over there to help us on all these fires that we were working on. Not just the Burwell fire.

The Court:    Let me stop just a second. Ladies and gentlemen of the jury, you're instructed, obviously, that the matter we're dealing with is this particular issue and not an investigation of others. But I'm going to let Captain Connard testify with regard to – so that you understand the context of what they were doing and in their investigations as they investigate all the fires in Knoxville. Go ahead please, sir.

-10-

A.     So we had had a – like I said, we had had a bunch of fires that weekend.  And I wasn't even involved in those which is unusual.  And I don't recall the circumstances of why I wasn't called.  I think they had called my house and – or they said they did and couldn't get a hold of me.  And I didn't even investigate any of those fires until like a Sunday.  They got a hold of me and I went to one fire.  But we had like 19 that weekend.

Q.     So you were aware that Sarah was at least someone that you were to interview about the Burwell incident?

A.     Well, yeah, she was – her and Jason Copley were suspects in all of these fires.  And that's what I was trying to get from her, to see if she would talk to me and tell me anything about them.  See – tell me what she knew.  Because they were our suspects.  They were out [sic] prime suspects.

This statement also violated the order in limine.  However, this witness was the defendant's witness.  Defendant's counsel never approached the bench regarding the statements in question.  The trial judge took it upon herself to issue a curative instruction regarding the testimony about the other fires.  The defendant's attorney even continued questioning the witness with the same line of questioning after the witness testified about the other fires.  In this situation, we can only conclude that the defendant is responsible for this violation of the order in limine.  Having occasioned this error the defendant should not get relief on account of it.  Tenn. R. App. P. 36(a).

For the reasons stated above, we find that this issue is without merit.

## **Sentencing**

The defendant's final issue is that the trial court erred in sentencing her to six (6) years as a Standard Offender.  The defendant argues that the trial court misapplied the enhancement factors under the United State Supreme Court opinions in Blakely v. Washington, 542 U.S. —, 124 S.Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S. 466 (2000).

The Tennessee Supreme Court recently determined that Blakely did not announce a new rule of law and that "the Tennessee Criminal Sentencing Reform Act does not authorize a sentencing procedure which violated the Sixth Amendment right to jury trial."  State v. Gomez, 163 S.W.3d 632, 651 n.16 (Tenn. 2005).  In Gomez, our supreme court determined that despite the ability of trial judges to set sentences above the presumptive sentence based on the finding of enhancement factors neither found by a jury nor admitted by a defendant, Tennessee's sentencing structure does not violate the Sixth Amendment and does not conflict with the holdings of Blakely v. Washington, 542 U.S. —, 124 S.Ct. 2531 (2004), United States v. Booker, — U.S. —, 125 S.Ct. 738 (2005), or United States v. FanFan, the case consolidated with Booker, because "[t]he Reform Act [of Tennessee] authorizes a discretionary, non-mandatory sentencing procedure and requires trial judges to consider the principles of sentencing and to engage in a qualitative analysis of enhancement and mitigating

factors . . . all of which serve to guide trial judges in exercising their discretion to select an appropriate sentence within the range set by the Legislature." <u>Gomez</u>, 163 S.W.3d at 661.

As stated above the defendant's issue with regard to the application of <u>Blakely</u> to her sentence is without merit. However, we are concerned with the structure of the defendant's sentence. The trial court sentenced the defendant to six (6) years for her arson conviction. The trial court ordered this sentence to be served on split confinement with six (6) months in jail and five (5) years and six (6) months on probation. The trial court also sentenced the defendant to six (6) years for aggravated burglary. This six (6) year sentence was ordered to be served on probation. The trial court ordered the defendant's sentence for aggravated burglary was not to start until the expiration of the defendant's sentence for arson. Therefore, the defendant's two six (6) year sentences become, in effect, consecutive sentences. At both the sentencing hearing and on the judgment forms, the trial court indicated that there was no basis for consecutive sentences and that both of the six (6) year sentences were to be served concurrently. However, the structure of this sentence leads to the consecutive service of the probationary portion of the defendant's sentences. There is no basis for such a sentence when the trial court has explicitly on the record stated that the sentences are to run concurrently. For this reason, we must remand the defendant's case for entry of a lawful sentence.

## <u>CONCLUSION</u>

For the foregoing reasons, we affirm the defendant's convictions and remand for the entry of a lawful sentence.

_____
JERRY L. SMITH, JUDGE

-12-