# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 16, 2011 Session

## STATE OF TENNESSEE v. BRETT JOSEPH PRICE

**Appeal from the Circuit Court for Montgomery County**
**No. 40900430     Michael R. Jones, Judge**

**No. M2010-01893-CCA-R3-CD - Filed December 20, 2011**

The Defendant, Brett Joseph Price, pled guilty to robbery, a Class C felony, and conspiracy to commit robbery, a Class D felony. See T.C.A. §§ 39-13-401, 39-12-103 (2010). He was sentenced as a Range I, standard offender to five years for robbery and to three years for conspiracy, to be served concurrently. On appeal, he contends that the trial court erred by (1) denying his motion to suppress his post-arrest statements and by admitting a statement at the sentencing hearing, and (2) imposing an excessive sentence and denying an alternative sentence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and DONALD P. HARRIS, SR. J., joined.

John E. Herbison (on appeal) and Carrie Gasaway (at trial), Clarksville, Tennessee, for the appellant, Brett Joseph Price.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; John W. Carney, District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to a robbery during which Anthony Wilson was injured and George Dyess was shot and killed. The record on appeal does not contain a transcript of the guilty plea hearing, but the record reflects that the Defendant entered his guilty pleas on May 17, 2010. An additional charge of felony murder was retired for one year, conditioned on the Defendant cooperating with the State's prosecution of two additional persons involved with the offenses.

Before entering his guilty pleas, the Defendant moved to suppress his pretrial statements on the grounds that the police failed to inform him of his <u>Miranda</u> rights before he spoke with the police at his home and that any statement given after he was read his rights was the result of the original unwarned statement. At the hearing on the motion to suppress, Clarksville Police Officer Arthur McCray testified that on January 8, 2009, he responded to a crime scene at Marla Circle. He said the Defendant's stepfather came to the scene and informed the police that the Defendant wanted to speak with a detective. He said that he was instructed to go to the Defendant's home and transport the Defendant to the police station and that he followed the Defendant's stepfather to their home. Two other officers also came to the Defendant's home.

Officer McCray testified that the Defendant's stepfather invited him into the home and that the Defendant was in the living room when he arrived. The Defendant appeared to be nervous. He said that he could not remember exactly what he said to the Defendant but that he believed he told the Defendant, "[Y]ou have something to say about what happened to Marla Circle . . . our detectives want to speak with you also, and I am here to transport you to them." He said that neither he nor the other officers asked the Defendant a question but that the Defendant started explaining what happened at the scene. He said that he did not ask the Defendant any followup questions and that he was in the Defendant's home for ten minutes at most before he drove the Defendant to the police station. He said the Defendant was not handcuffed, that he was never asked to leave the Defendant's home, and that the Defendant's parents followed him to the police station. The Defendant did not appear to be intoxicated.

On cross-examination, Officer McCray agreed that he was sent to the Defendant's home to bring the Defendant to the police station to speak with detectives. He agreed that the Defendant was nervous and distraught and that he told the Defendant something similar to, "I heard that you have something to say about what happened on Marla Circle." He agreed he did not advise the Defendant or the Defendant's parents of the Defendant's right to remain silent but said he did not question the Defendant "about anything." He said he did not hear anyone advise the Defendant of his rights. He said he spent ten minutes in the home because the Defendant began telling him what happened before he could take the Defendant to the police station. He agreed the Defendant was not free to leave the home. He did not remember the Defendant saying anything on the way to the police station. He did not know if the Defendant's statement was recorded, but he did not have recording equipment with him that night. He agreed he knew the Defendant was a teenager.

Clarksville Police Officer Scott Thompson testified that he followed Officer McCray to the Defendant's home and that Officer McCray was instructed to bring the Defendant to the police station to speak with a detective. They were invited into the home by the

Defendant's stepfather, and the Defendant and his mother were present. He said he stood about ten feet away from the Defendant and Officer McCray because his purpose for being at the house was to ensure Officer McCray's safety. He heard Officer McCray tell the Defendant that the Defendant needed to come with Officer McCray to speak with a detective about an incident that occurred earlier that evening. Officer Thompson said he did not ask the Defendant a question and did not hear Officer McCray ask the Defendant any questions. He heard the Defendant repeatedly ask if the victim was "ok." He said that the Defendant was solemn and nervous and that they remained in the home for ten minutes or less before leaving.

On cross-examination, Officer Thompson testified that Officer McCray did not ask the Defendant any questions but agreed that a statement such as, "I hear you might have something to say about what happened on Marla Circle," could potentially elicit a response from a suspect. He did not remember if Officer McCray made such a statement. He said Officer McCray explained to the Defendant that the Defendant needed to come speak with a detective. He did not hear anyone advise the Defendant of his right to remain silent. He agreed that the Defendant was not free to leave and that he, Officer McCray, and a sheriff's deputy went to the home to transport the Defendant to the police station for questioning. He said he did not think the Defendant was handcuffed before being placed into the patrol car.

Officer Thompson testified that he did not originally recognize the Defendant's name when he was subpoenaed to testify and that he spoke with an investigator to refresh his memory of the Defendant. He said that he and the investigator did not discuss "the importance" of showing that the Defendant was not questioned at the home but that the investigator mentioned the "crux" of the hearing would involve whether the Defendant was questioned. He agreed that the Defendant was nervous while in the home and that he knew the Defendant was a teenager.

Montgomery County Sheriff's Deputy Charles Hummel testified that he followed Officer McCray and Officer Thompson to the Defendant's home. He said that they remained there for eight to ten minutes and that the Defendant's mother, stepfather, and brother were present. He said that neither he nor the other officers questioned the Defendant but that he could not hear exactly what Officer McCray or the Defendant said. He said that he heard Officer McCray ask the Defendant what his name was and that the Defendant was upset and repeatedly asked if the victim would be "ok." He said the Defendant was not handcuffed before being put in Officer McCray's police cruiser.

On cross-examination, Deputy Hummel agreed that he would not have immediately left the home had he been asked to do so. He said that the Defendant was not detained while in the house but that the Defendant was escorted to the police car by Officer McCray. He

agreed he previously testified at a juvenile court hearing that he thought the Defendant was being detained for questioning and the officers planned to take the Defendant to speak with an investigator at the police station. He said the Defendant was detained once they left the house.

Deputy Hummel agreed that the Defendant was upset and that he did not hear everything said between the Defendant and Officer McCray. He agreed that it was possible that Officer McCray asked a question that he could not hear and that it was possible to make a statement designed to elicit a response from a suspect. He said Officer McCray was involved in a conversation with the Defendant and the Defendant's parents. He did not hear anyone advise the Defendant of his right to remain silent. He agreed that he and the other officers wore their uniforms while in the home, including their weapons, and that he and Officer Thompson stood between the Defendant and the door to the home. He agreed he knew the Defendant was young.

Clarksville Police Detective Timothy Anderson testified that he spoke with the Defendant at the police station and that the Defendant arrived around 12:30 a.m. with his family and Officer McCray. He did not know if the Defendant was handcuffed. He said the Defendant was placed in an interview room for about five minutes before his mother came to the room. He said that the Defendant was alone in the room during that time and that no questions were asked. He said that when he entered the room with the Defendant's mother, the Defendant asked if the victim was "ok."

Detective Anderson testified that the first thing he did upon entering the interview room was place a written copy of the Miranda rights and a waiver in front of the Defendant and his mother. He said he read the form to the Defendant. He said that the Defendant stated he understood the rights and that the Defendant and his mother signed a waiver of those rights. He said that he watched the Defendant and his mother sign the waiver and that neither of them indicated they did not understand the document. He said the waiver was signed at 12:47 a.m. He said he then asked the Defendant to explain "what it was that he wanted us to know" about the shooting. He said the Defendant explained that he encountered the victim drug dealer in court earlier that morning, that he got in touch with two other persons about robbing the victim during a drug deal, that he arranged for the drug deal to occur in a house that he and his family recently vacated, that they robbed the victim in the house, that the victim's friend came into the house during the robbery, and that one of the persons with the Defendant shot the victim's friend. Detective Anderson said the Defendant's mother filled out an interview form and provided her contact information while the Defendant told him what happened. He said that the Defendant's mother was upset after hearing the Defendant's statement and that she left the room, but later returned.

-4-

Detective Anderson testified that he asked the Defendant to write a statement and the Defendant did so. He said he left the room but did not know if the Defendant's mother was in the room while the Defendant wrote and signed the statement. He said the Defendant took "a while" to write the statement. He identified the statement and said that it was written at 1:15 a.m. and that the Defendant signed it. He said that after the Defendant completed the statement, he advised the Defendant and his parents that the Defendant would be charged.

On cross-examination, Detective Anderson testified that the Defendant was not free to leave when the officers came to his home. He said was unsure but thought the Defendant was in handcuffs when he arrived at the police station. He said he spoke briefly with Officer McCray when they arrived and was told the Defendant made a statement at the Defendant's home. He said he asked Officer McCray to write down what the Defendant said. He agreed that he spent about five minutes explaining the Miranda rights and the waiver to the Defendant and that this was the same amount of time he spent explaining the rights to adult suspects. He said he did not tell the Defendant that previous statements not preceded by Miranda warnings would not be admissible against him.

Detective Anderson testified that he thought the Defendant's mother filled out the interview form while the Defendant explained what happened. He agreed there was not a clock in the interview room and said he looked at his cell phone and told the Defendant what time to write on the rights and waiver form. He said he did not tell the Defendant's mother what time to write on the interview form she completed. He agreed the rights and waiver form and the interview form had the same time written on them. He said the Defendant's mother must have seen the time noted on the waiver and written the same time on the interview form. He denied that the interview form was filled out before the waiver and said the first thing he did in the interview room was explain the Defendant's rights and have him sign the waiver. He agreed that he previously testified at a hearing in juvenile court that the Defendant's mother filled out the interview form with contact information before he advised the Defendant of his Miranda rights and obtained a waiver. He agreed he said earlier that he thought the Defendant's mother filled out the form while the Defendant explained what happened, but he denied that he elicited information from the Defendant before obtaining the waiver.

Regina Weedon, the Defendant's mother, testified for the defense that her husband drove to Marla Circle on January 8, 2009, after the Defendant told them that someone was hurt there. She was present when three uniformed officers came to her home. She said Officer McCray approached the Defendant and stated that "he knew what happened over on Marla Circle and that all [the Defendant] needed to do was tell him his side of the story." She said the Defendant asked if the victim was "ok" and then told Officer McCray what happened. She said Officer McCray then stated he needed to take the Defendant to speak

with detectives at the police station. She said no one advised the Defendant of his right to remain silent.

Ms. Weedon testified that she and her husband followed the officers to the police station. She said that she met Detective Anderson when she arrived, that he asked her to tell him what the Defendant had told her, and that she did so. She said they went into an interrogation room where the Defendant was waiting. She said that the room was small and that although she initially attempted to sit next to the Defendant, Detective Anderson told her to move to the other side of the table. She said Detective Anderson then began questioning the Defendant. She said the questioning began before Detective Anderson informed the Defendant of his rights. She said Detective Anderson never told the Defendant that any previous statements not preceded by Miranda warnings would be inadmissible. She said Detective Anderson had her and the Defendant sign forms after the Defendant explained what happened.

Ms. Weedon was shown an interview form and testified that she thought it was her handwriting on the page. She said that she did not read the form but that Detective Anderson read it to her. She said Detective Anderson began questioning the Defendant "way before" she began filling out the interview form. She agreed that the waiver form and the interview form had the same time written on them: 12:47 a.m. She said she thought Detective Anderson wrote the time on the rights and waiver form. She said she wrote the time on the interview form. She said that there was not a clock in the interview room and that Detective Anderson provided the time. She said she was not present when the Defendant wrote his statement because Detective Anderson asked her to leave the room. She agreed that the Defendant was in juvenile court on the morning of the robbery and that he was in court for fighting in school.

On cross-examination, Ms. Weedon agreed that her husband went to the scene for the purpose of having the police speak with the Defendant. She agreed the Defendant told the officers what he wanted to tell them about the robbery. She did not see the officers place handcuffs on the Defendant. She agreed that she signed the waiver form but that she did not remember the form being executed. She said that although Detective Anderson read part of the rights and waiver form to the Defendant, he never stated that the Defendant had the right to remain silent. She said Detective Anderson had his hand over the waiver when she signed it. She agreed she thought Detective Anderson wrote "12:47" on the waiver. She agreed she filled out the interview form, including the time noted on the form. She did not remember the time being written on the rights and waiver form when she signed it and agreed the time was added on the document after she signed it. She agreed that she did not know the time when she filled out the interview form and that she wrote the time on the form after Detective Anderson looked at his cell phone and told her what time it was.

-6-

On redirect examination, Ms. Weedon testified that before her husband went to the scene, they did not discuss whether the Defendant would give a statement to the police. She said her husband went to the scene not to have the police come obtain a statement from the Defendant, but rather to ensure that the victim received help.

The trial court denied the motion to suppress. The trial court found that although the Defendant was in custody when he spoke with a police officer at his home, Miranda warnings were not required at the time because the Defendant's statements were not the result of interrogation. The trial court found that Officer McCray did not ask a question, that he had no way of knowing his statement to the Defendant, that he "heard that [the Defendant] had something to say about what happened . . . our Detectives want to speak with you . . . and I am here to transport you to them," was likely to evoke an incriminating statement, and that the Defendant's response was unforeseen. The trial court also found that all subsequent statements made by the Defendant occurred after he was advised of his Miranda rights. The Defendant pled guilty to robbery and conspiracy to commit robbery.

At the sentencing hearing, the State introduced the presentence report. The report states that on January 8, 2009, the Defendant, Terry Smith, and Craig Fulton, Jr., agreed to rob Anthony Wilson during a drug deal. The Defendant brought Mr. Wilson into his home under the pretense that he would buy marijuana from Mr. Wilson, while George Dyess, Mr. Wilson's friend, remained outside. The Defendant, Mr. Smith, and Mr. Fulton beat Mr. Wilson and took the marijuana from him. During the robbery, Mr. Dyess came into the home to help Mr. Wilson. Mr. Dyess was shot several times and died as a result of his injuries.

Jenita Louise Taylor testified that Mr. Dyess was her son and that they had a close relationship. She said Mr. Dyess had two young children who would not have the chance to know their father. Willie Ray Taylor testified that Mr. Dyess was his son. He said Mr. Dyess's death traumatized their entire family. Jessica Dyess testified that Mr. Dyess was her brother and that his death tore their family apart.

Detective Anderson testified that he investigated the Defendant's case. He identified a statement written by the Defendant on January 9, 2009, and said the Defendant informed the police that Mr. Smith and Mr. Fulton were involved in the robbery and murder. The signed statement said:

> When I was in court today A.J. came up to me and said
> he was getting 2 ounces he said if I needed anything to call him
> but I told him to take my number and I told him it was 378-1453
> so he called a little bit after I got out of school and said if I
> needed anything to hit him up so I called Terry Smith and asked

him if he wanted to hit a lick he said yes [and] Craig Fulton was with him. I told him about what A.J. said so he 3 wayed him to find out if it was the truth after he found out he came over and picked me up from 1811 Hiltopp Rd and drove me down below 3844 Marta circle in a dead end and we seen that A.J. was there so I called him and told him that he needed to meet me at the [BP]. I seen him leave then we made [our] way inside the house then I called him back and told him my home boy dropped me off so it was just me and him in the house. He came back to the house I met him outside were him and his friend was coming in and I told him I don't like strangers up in my house. He said ok that cool so we went inside and I asked him where the quarter [and] the half was he said right here and pulled them out with a scale to weigh it after I weighed it I yelled out its straight and Terry Smith and Craig Fulton both came out and we robbed him and his boy kicked the door in and I dunno if he had a gun in his hand or what but Terry Smith shot him. Terry Smith was the only one with a gun out of me [and] Craig Fulton. Terry shot A.J.'s friend and both of them ran to the car and drove somewhere. I stayed locked my doors and ran to hop the fence and tried to catch up with Terry [and] Craig but their car was already down the road. So I took off running and got a ride home.

On cross-examination, Detective Anderson agreed that the Defendant's stepfather came to the scene after the shooting to check on Mr. Dyess and that the Defendant asked his stepfather to do so. He agreed the Defendant's stepfather led the police back to his home, where the Defendant was waiting. He agreed the Defendant was cooperative and told the police what happened. He said that as far he knew, the Defendant was truthful with the police. He said that the police had only a vague description of the other persons involved with the robbery and shooting and that it would have been very difficult to develop suspects without the Defendant's cooperation. He agreed that the Defendant intended to cooperate with the prosecution of Mr. Smith and Mr. Fulton and that it would be very difficult to prosecute them without the Defendant's cooperation.

Regina Weedon testified that she was the Defendant's mother. She said that he completed the eighth grade while in jail and that he continued his education after he was released from custody pending the sentencing hearing. She identified the Defendant's home-school education records and said that the Defendant took his education seriously and that his cumulative grade point average was 93.57. She said that the Defendant was fifteen years

old when he was released from jail and that he performed yard work and painting for family friends after being released because he was too young to find employment.

Ms. Weedon testified that she had a large family and that they supervised the Defendant continuously after he was released. She said that the Defendant had a more mature outlook and that he wanted to resume attending public school. She asked the trial court to grant judicial diversion.

On cross-examination, Ms. Weedon agreed that the Defendant did not do well in public school and had confrontations with others. She agreed that some of the confrontations resulted in charges in juvenile court and that the Defendant was also charged with assaulting her husband. She did not know that the Defendant received diversion on those charges but said she would not dispute records noting that he received diversion. She agreed that the changes she saw in the Defendant occurred after the crime in this case and after he was jailed.

Ms. Weedon testified that the grades the Defendant earned while in jail and after being released were better than those he received in public school. She agreed that many of the Defendant's problems developed from being in a public school environment and associating with the other students. She said she was committed to educating the Defendant at home.

On redirect examination, Ms. Weedon agreed that in the summer of 2008, the Defendant visited his biological father, who told the Defendant that "he never wanted him in the first place, that he wished [the Defendant's mother] had aborted him . . . ." She said that the Defendant was angry when he returned home and that the Defendant's assault charges occurred after he visited his father. She agreed that the Defendant was "tremendously affected" by the crimes in this case, even before being jailed, and she did not think he needed further confinement.

The Defendant testified that he was sorry for what he did and that he did not intend for anyone to be harmed. He said that he did everything possible to help Mr. Dyess and that he would help the State prosecute the person who killed Mr. Dyess. He apologized to the victim's family.

The trial court noted its consideration of the evidence received at previous hearings and the sentencing hearing and its consideration of the Defendant's statement to the police that was introduced at the sentencing hearing. In denying judicial diversion, the trial court stated that it was unable to determine whether the Defendant was amenable to correction, but found that the circumstances of the offense, the Defendant's social history, and the

deterrence value to the Defendant and others outweighed any factors in favor of granting diversion. The court found that the Defendant planned the robbery and that diversion would not serve the interests of justice.

The trial court found that enhancement factor (2) was applicable because the Defendant planned the robbery and convinced the victims to come to the home where the crimes occurred. See T.C.A. § 40-35-114(2) (2010) (the defendant was a leader in the commission of an offense involving two or more criminal actors). The trial court found that factor (12) applied because the actions of the Defendant resulted in the death of Mr. Dyess. See T.C.A. § 40-35-114(12) (during the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim). The trial court found that mitigating factors (9) and (13) applied because the Defendant assisted the police in apprehending the other persons involved with the crimes and the Defendant stayed out of trouble after being released from jail and furthered his education. See T.C.A. § 40-35-113 (9), (13) (2010). The trial court sentenced the Defendant as a Range I, standard offender to five years' confinement for robbery and to three years' confinement for conspiracy, to be served concurrently. This appeal followed.

We begin by noting the unique situation facing the court in this case. The State contends that (1) by pleading guilty, the Defendant has waived consideration of whether the trial court erred by admitting his statement at the sentencing hearing and (2) the Defendant has waived review of his sentence by failing to include a transcript of the guilty plea hearing in the appellate record.

The Rules of Criminal Procedure and Appellate Procedure allow an appeal from a guilty plea under very narrow circumstances. See Tenn. R. Crim. P. 37(b)(2); T.R.A.P. 3 (b). Under these provisions, an appeal lies from a plea of guilty if: (1) at the time the defendant entered a guilty plea, he or she explicitly reserved the right to appeal a certified question of law that was dispositive of the case pursuant to and in compliance with the requirements of Rule 37(b)(2); (2) the defendant seeks review of the sentence and there was no plea agreement concerning the sentence; or (3) the errors complained of were not waived as a matter of law by the guilty or nolo contendere plea, or otherwise waived, and such errors are apparent from the record of the earlier proceedings.

The State argues that the Defendant has waived consideration of the first issue because the voluntary and informed entry of a guilty plea "constitutes an admission of all facts necessary to convict and waives all non-jurisdictional defects and constitutional irregularities which may have existed prior to the entry of the guilty plea." State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). We disagree.

Although a trial court must afford the parties the opportunity to present relevant evidence at the sentencing hearing, the rules of evidence remain in effect at a sentencing hearing. See T.C.A. § 40-35-209(b) (2010). Tennessee Code Annotated section 40-35-209(b) "shall not be construed to authorize the introduction of any evidence secured in violation of the United States or Tennessee constitutions." Id. Here, the Defendant seeks review of his sentence and challenges the admissibility of material upon which the trial court relied when determining his sentence. He argues that the evidence was secured in violation of the United States and Tennessee constitutions. There was no plea agreement concerning the sentence. A challenge to a sentence extends to items considered by the trial court in imposing the sentence. Although we conclude that the Defendant has not necessarily waived this sentencing issue by pleading guilty, we note that the Defendant failed to object to the admission of his statement at the sentencing hearing.

A contemporaneous objection to the admission of evidence at the time the evidence is introduced is normally required to prevent waiver of the evidentiary issue on appeal. See T.R.A.P. 36(a); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Although this court has held that an objection at the trial is not always required to preserve a suppression issue for appeal when the issue was presented in a pretrial suppression motion and the trial judge has "clearly and definitively ruled" on the issue, here the Defendant filed a pretrial motion to suppress but subsequently pled guilty and waived all evidentiary issues for purposes of determining his guilt. See State v. Brobeck, 751 S.W.2d 828, 833-34 (Tenn. 1988); Pettus, 986 S.W.2d at 542. This raises the question of whether, after a trial court denies a pretrial motion to suppress evidence and a defendant pleads guilty, an additional objection at the sentencing hearing is required to prevent waiver of the issue on appeal. In light of our determination, however, that the Defendant's failure to provide an adequate record on appeal has precluded a de novo review of his sentences and of whether any error in admitting his statement at the sentencing hearing was harmless beyond a reasonable doubt, we need not address that question now.

On appeal, the Defendant was required to prepare a record that conveyed a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of the appeal. T.R.A.P. 24(b); State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). The 1989 Sentencing Act, as amended, requires a sentencing court to consider evidence received at the trial. T.C.A. § 40-35-210(b)(1). With a guilty plea involving a felony, the evidence supporting the plea and finding of guilt is usually submitted by proffer or stipulation. "For those defendants who plead guilty, the guilty plea hearing is the equivalent of trial . . . ." State v. Keen, 996 S.W.2d 842, 843 (Tenn. Crim. App. 1999).

This court considers the guilty plea hearing transcript to be vital to a de novo review and potential resentencing by this court as required by law. See, e.g., State v. Alfred Gettner,

No. E2010-00104-CCA-R3-CD, Sullivan County, slip op. at 6 (Tenn. Crim. App. Aug. 19, 2011); State v. Felix Tamayo, No. M2010-00800-CCA-R3-CD, Davidson County, slip op. at 3-4 (Tenn. Crim. App. May 16, 2011); State v. Gary M. Carter, No. M2006-02341-CCA-R3-CD, DeKalb County, slip op. at 4 (Tenn. Crim. App. Feb. 21, 2008); T.C.A. § 40-35-401 (2010). The "'failure to include the transcript of the guilty plea hearing in the record prohibits the court's conducting a full de novo review of the sentence under [Tennessee Code Annotated section] 40-35-210(b).'" State v. Farmer, 239 S.W.3d 752, 756 (Tenn. Crim. App. 2007) (quoting State v. Shatha Litisser Jones, No. W2002-02697-CCA-R3-CD, Madison County, slip op. at 4 (Tenn. Crim. App. July 14, 2003)). No matter how developed a record may appear, we will never know the full extent unless the guilty plea transcript is included. "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); see also State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

With regard to the admission of the Defendant's statement during sentencing, if we determined that the statement was obtained in violation of Miranda, an "irrebuttable" presumption would arise that the Defendant's statement was the result of compulsion and in violation of constitutional rights protecting him from being compelled to give evidence against himself. State v. Smith, 834 S.W.2d 915, 918 (Tenn. 1992) (citing Oregon v. Elstad, 470 U.S. 298, 307 (1985)); U.S. Const. amend. V; Tenn. Const. art. I, § 9. In determining the effect of that error and whether it was harmless beyond a reasonable doubt, we would be required to determine if the sentence would have been the same had the unconstitutional evidence not been admitted. State v. Howell, 868 S.W.2d 238, 260-61 (Tenn. 1993); State v. Leonard J. Young, No. W2002-03012-CCA-R3-DD, Shelby County, slip op. at 30 (Tenn. Crim. App. Feb. 9, 2005) (stating that in order for this court to conclude that improperly admitted evidence during sentencing was harmless error, "we must first conclude, beyond a reasonable doubt, that the sentence would have been the same absent such evidence."). The Defendant's failure to include the guilty plea transcript in the record, and our resulting inability to conduct a de novo review of his sentences, precludes a determination of whether the admission of potentially improper evidence was harmless beyond a reasonable doubt. We conclude that the Defendant's failure to provide an adequate record leaves us unable to resolve his issues on appeal and requires us to conclude that the trial court's rulings were supported by sufficient evidence. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE