STATE of Tennessee,
Appellee/Appellant,

v.

Randolph Wayne BROBECK,
Appellant/Appellee.

Supreme Court of Tennessee,
at Knoxville.

May 2, 1988.

W.J. Michael Cody, Atty. Gen. & Reporter, Kathy M. Principe, Asst. Atty. Gen., Nashville, for appellee/appellant.

J. Ronnie Greer, Melody Kranifeld Starr, Greeneville, for appellant/appellee.

Kenneth J. Ries, Neal & Harwell, Paul J. Morrow, Jr., Nashville, for amicus curiae Tennessee Ass'n of Criminal Defense Lawyers.

## OPINION

FONES, Justice.

Defendant was convicted of felony murder and aggravated rape. He was sentenced to life imprisonment after the State withdrew its demand for the death penalty at the request of the victim's family. He received a concurrent sentence of forty years for the offense of aggravated rape. The Court of Criminal Appeals affirmed the felony murder conviction and reversed and dismissed the conviction for aggravated rape.

We granted the State's Rule 11, T.R.A.P., application to consider the correctness of the action of the Court of Criminal Appeals in finding as a matter of law that defendant could not be guilty of rape because of the pathologist's opinion that the victim was "brain dead" at the time of penetration.

We granted defendant's rule eleven application to consider whether defendant's failure to object at trial to evidence defendant had unsuccessfully sought to exclude by a motion in limine, waived appellate review of that issue as held by the Court of Criminal Appeals.

Shirley Fair, the victim, and her husband lived in a somewhat secluded residence near Mosheim in Greene County, Tennessee. Mr. Fair was out of the state on a construction job at the time of the crime. The victim's friends, Mr. and Mrs. Charles Weems, discovered her body shortly after

5:00 a.m. on Sunday, 2 September, 1984. The victim and the Weems had planned to leave at 5:00 a.m. for an outing at Cades Cove. Immediately upon discovery of the body the Weems notified the sheriff's office and an extensive investigation was promptly initiated.

Dr. Cleland Blake, a forensic pathologist, examined the body of Shirley Fair where it was found on the floor of the bedroom at the Fair residence on the day of the crime and later performed an autopsy at the crime laboratory in Greeneville. He testified that death resulted from a single contact gunshot that entered to the left of center of the forehead, travelled straight back through the brain, bounced off the bone on the back inner surface and deflected across the mid-line in the rear portion of the brain. There was no exit wound, and a twenty-two caliber bullet was recovered from the back part of the brain. The victim had a lacerated or torn scalp on top of the head, left of center, that Dr. Blake testified was inflicted by a blunt object. There were also bruises on the left and right upper arms "consistent with firm hand grabbing" bruises on the right cheek and base of the nose and a rub or compression abrasion on the left cheek. Based on their coloration and patterns, Dr. Blake testified that the bruises were inflicted before death.

Dr. Blake found clusters of well preserved sperm in the victim's vagina and a mass of semen on the left labium just outside the vaginal opening. He sent samples to the laboratory for further analysis. A seriologist testified that defendant had ABO blood, type A, PGM type one and is a type A secretor. The sperm specimen removed from the victim was identified as being from a person with ABO blood type A, PGM one, and a type A secretor.

The bedroom scene indicated that a violent struggle had taken place. A lamp and another object were on the floor in front of a bedside night stand, the top drawer of which was open. A box of twenty-two caliber long rifle bullets was found in that drawer. The bullet removed from the victim's brain was similar to and consistent with the bullets found in that drawer. The telephone receiver was off its base and the victim's underpanties, wrong side out, were lying on the bed. The murder weapon was not found.

I.

The Court of Criminal Appeals held that the "evidence demonstrated that the appellant was attempting to carry out the intended rape, but killed his victim before sexual penetration"; that as a matter of law there is no crime of rape by the sexual penetration of a dead person "however short the interval since death;" and that the legislature in enacting T.C.A. § 39-2-603 [1] "intended to prevent such indignities only to the living." The conviction for aggravated rape was reversed and dismissed.

The only evidence presented on the factual question of whether sexual penetration occurred before or after death was the opinion testimony of Dr. Blake. He testified that the victim was wearing a sleeping gown and a housecoat. The front of those garments had elongated blood droplets "in an oval or teardrop pattern" from which Dr. Blake concluded that the victim was standing erect when the bullet entered her

---

1. **39-2-603. Aggravated rape.**—(a) Aggravated rape is unlawful sexual penetration of another accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

(2) The defendant causes personal injury to the victim;

(3) The defendant is aided or abetted by one or more other persons; and

(A) Force or coercion is used to accomplish the act; or

(B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated, or physically helpless;

(4) The victim is less than thirteen (13) years of age.

(b) Aggravated rape is a felony punishable by imprisonment in the penitentiary for life or a period of not less than twenty (20) years.

(c) Aggravated rape is a Class X felony.

head. Dr. Blake was asked how long the victim had lived after she was shot in the head and he responded as follows:

She was down and brain down instantly. By instantly I mean a few seconds. Her heart continued to beat likely for some five minutes because [of] the fluid build up in the lungs. Fluid will build up in a very few minutes into the lungs. I don't mean a six to eight hundred gram lung. Normal drug lungs would be about two hundred grams in a person this size and her lung weights were three sixty and three hundred grams so she built up a little fluid. It takes a few minutes to do that and I would estimate five minutes, plus or minus a minute or so. I don't think she lived at the outside in terms of heart beat for more than ten minutes at the outside.

On cross examination Dr. Blake was asked his opinion on whether intercourse occurred before or after death and he responded as follows:

It is my opinion that it occurred after death, based on the position of the clothing, the fact that she was lying down and had she been standing up or had she moved after the intercourse the clothing which was pushed up around the breasts would have fallen down. The fact that the body was in this position and the legs were apart, the gunshot wound had been inflicted before she was down on the floor because of the blood splattering patterns, it is my opinion that in high likelihood that the intercourse occurred with the body down.

The legal definition of death in this State is found in the Uniform Determination of Death Act codified at T.C.A. § 68–3–501 et seq. T.C.A. § 68–3–501(b) reads as follows:

(b) An individual who has sustained either:

(1) Irreversible cessation of circulatory and respiratory functions; or

(2) Irreversible cessation of all functions of the entire brain, including the brain stem;

is dead. A determination of death must be made in accordance with accepted medical standards.

■ The Court of Criminal Appeals reached the conclusion that Dr. Blake's testimony established the fact that Mrs. Fair was "brain dead" at the time she was sexually penetrated. We think that Dr. Blake's opinion testimony failed to establish as a matter of law that Mrs. Fair was legally dead at the time penetration, the final element of the crime of rape, occurred, and that that factual issue was for the jury to determine.

Accepting Dr. Blakes' testimony at its face value, an irreversible cessation of circulatory and respiratory functions may not have occurred until approximately ten minutes after the victim was shot and it is almost certain that penetration occurred within that period. Also, it is not possible to conclude from Dr. Blake's testimony that "brain down instantly," or in a few seconds, is synonymous with "irreversible cessation of all functions of the entire brain, including the brain stem."

■ But assuming that the fact was established that Mrs. Fair was legally dead when penetration occurred, we hold that the Court of Criminal Appeals erred in reversing and dismissing the conviction of aggravated rape.

That Court failed to articulate the basis for its conclusion that the legislature "intended" that the statute apply "only to the living." There is not a single word or phrase in the statute from which such intent can be derived and there is no ambiguity in the statute that would permit a search beyond its express terms for such intent.

*Lipham v. State,* 257 Ga. 808, 364 S.E.2d 840 (1988) is one of the few cases from the courts of our sister states that has directly addressed the issue of whether the victim must be alive at the very moment of penetration to commit the crime of rape. In *Lipham,* the victim's body was found lying on her bed, nude from the chest down with her legs spread apart. She had a contact gunshot wound on the left side of her head. The court found that there was sufficient evidence to support a finding that defendant had had sexual intercourse with the

victim and then addressed the issue raised by defendant that he could not be guilty of rape because the State did not prove that the victim was alive when the rape occurred.

We quote from the opinion of the Supreme Court of Georgia as follows:

The offense of rape is defined in our Code as follows: "A person commits the offense of rape when he has carnal knowledge of a female forcibly and against her will. Carnal knowledge in rape occurs when there is any penetration of the female sex organ by the male sex organ." OCGA § 16–6–1(a).

There is nothing in this code section which precludes a finding of rape if the victim is not alive at the moment of penetration. What the jury must find is that the defendant had carnal knowledge of the victim "forcibly and against her will." *Id.*

We have not heretofore addressed the effect of the use of deadly force to overcome the victim's resistance in a rape case. . . .

If the element of force is satisfied where the defendant has used less than deadly force to overcome the victim's resistance so as to allow him to have carnal knowledge of the victim, the element of force is surely no less satisfied when the defendant has used deadly force to accomplish his aim.

As for the remaining element, "against her will" has been interpreted to mean "without her consent," and has been satisfied in cases in which the victim was drugged, asleep, unconscious, or in a coma. [citations omitted]. We see no reason why it should be any less applicable in a case in which the defendant has rendered the victim permanently unconscious by killing her.

The facts here differ fundamentally from a case in which one happens upon a corpse of a female and engages in sexual intercourse with it. The use of force in the former and the absence of force in the latter is the difference. One is rape and the other necrophilia, made a crime under OCGA § 16–6–7.

The evidence in this case supports the jury's finding that the defendant had carnal knowledge of Kate Furlow forcibly and against her will notwithstanding that it is unclear whether the defendant first raped the victim and then killed her or first killed the victim and then raped her. *Id.* at 842–43.

Although the language of the Tennessee Aggravated Rape Statute differs from the Georgia statute, the elements of the offense are the same, unlawful or non-consensual sexual penetration, accompanied by the use of force and the use of a weapon. We are likewise unable to embrace the notion that the fortuitous circumstance, for the rapist, that death may have preceded penetration by an instant, negates commission of the crime of aggravated rape and reduces it to a relatively minor offense associated with erotic attraction to dead bodies. Reading the "live only" requirement into the statute encourages rapists to kill their victims, in our opinion.

It is likely that Kentucky, Pennsylvania and California would reach a different result if squarely confronted with this issue. *See Smith v. Commonwealth,* 722 S.W.2d 892 (Ky.1987); *Commonwealth v. Sudler,* 496 Pa. 295, 436 A.2d 1376 (1981); and *People v. Stanworth,* 11 Cal.3d 588, 114 Cal.Rptr. 250, 522 P.2d 1058 (1974). In each of these cases, however, either the statute itself or its official commentary contained language that could be fairly construed as requiring the victim to be living at the time of penetration. We prefer to align ourselves with the Supreme Court of Georgia on this issue.

## II.

Defendant filed a written motion in limine objecting to the anticipated testimony of Lori Hicks, Bridgett Land and Deanna Payne concerning sexual assaults alleged to have been committed upon the three of them by defendant. At a pre-trial hearing upon that motion the prosecutor furnished the trial judge with a written statement of the proposed testimony of those witnesses that stressed the points of similarity between the rape of Mrs. Fair and each of the

alleged prior rapes. That hearing was held on 26 July 1985. On 31 July 1985, the trial judge filed a memorandum opinion wherein he ruled that the testimony of Deanna Payne would be suppressed but that the testimony of Lori Hicks and Bridgett Land was relevant and admissible. On 23 August 1985, defendant asked the trial court to reconsider his motion to suppress the testimony of Lori Hicks and Bridgett Land. Again on the opening day of trial, 26 August 1985, the following occurred:

MR. GREER: Your Honor, before we begin, we raised an evidentiary question in Morristown—

THE COURT: I'll take that up before you begin your voir dire. I haven't forgotten about it.

Whereupon all jurors were excused from the courtroom, and the following proceedings were had, to wit:

THE COURT: I have considered the defendant's motion to have the court hear the testimony of the witnesses that the State had represented by written factual submissions to the Court as to what their testimony would be, and in considering that, as to whether I should hear those fully to determine whether the evidence, prior to admitting it at the trial, was clear and convincing.

It's my considered judgment after weighing all those factors that we discussed in the motion for admission—the court would simply rely upon the submissions made to the court prior hereto; that it would involve substantially trying the matter fully and completely. Of course, that's an awkward position to be in. If the State fails to prove what the factual submissions state they will prove then the case will simply have to be declared a mistrial.

So, the State certainly has to be sure that that will be the proof in the matter, and that the proof will be clear and convincing as represented to the court.

To do otherwise would be to substantially to try the case twice. That's a large part of the State's proof in the case and there is no way to hear the evidence and weigh it without hearing it all, which, in my judgment, will take a substantial length of time, and it is not necessary if the representations made by the State as to the identifications, positive in nature and positive factual testimony is as related by the State in its factual submissions to the court.

So therefore the court will rely upon that as it did in the original order without change at this time.

And with that admonition—certainly if it isn't borne out by the proof then the State is in bad trouble with that.

The two witnesses testified on 28 August 1985, and defendant made no objection contemporaneous with their testimony.

■ The Court of Criminal Appeals held that a party whose motion in limine has been overruled must object when the alleged error he sought to prevent is about to occur at trial, and that only a proper objection at trial can preserve error for appellate review, citing Court of Criminal Appeals cases and a United States Fifth Circuit case. That ruling was clearly erroneous under this Court's holding in *Goines v. State*, 572 S.W.2d 644 (Tenn.1978), of which no mention was made by the Court of Criminal Appeals. More recently, in *State v. McGhee*, 746 S.W.2d 460 (Tenn.), released 22 February 1988 in Nashville, we reaffirmed *Goines* "where the record on a pre-trial suppression motion or on a motion in limine clearly presents an evidentiary question and where the trial judge has clearly and definitively ruled." Defendant's counsel pursued the evidentiary question in this case to the point that further objection would have been an idle ceremony and a useless gesture. Defendant clearly presented an evidentiary question and the trial judge clearly and definitely ruled in a written memorandum opinion four days after the motion in limine was heard. In response to defendant's motion to reconsider and to defer a final ruling until after hearing the testimony of Lori Hicks and Bridgett Land, out of the presence of the jury, the trial judge denied that request, for the reason quoted above, with the caveat that if the testimony of those witnesses was not in harmony with the factual sub-

mission the State had presented at the pretrial hearing, defendant would be entitled to a mistrial. The trial of the case proceeded and Hicks and Land testified before the jury, in due course, two days later. Clearly, as was said in *Goines,* further effort by defense counsel would have been, "argumentative, repetitious and foredoomed to certain failure." 572 S.W.2d at 649.

We have carefully considered the remaining issues urged by defendant, to-wit: the admission of the testimony of Lori Hicks and Bridgett Land and the sufficiency of the evidence to convict defendant of murder in the first degree and are satisfied that the Court of Criminal Appeals has dealt with them correctly.

The judgment of the Court of Criminal Appeals in dismissing the conviction for aggravated rape is reversed and the trial court judgment reinstated; the conviction and sentence for murder in the first degree is affirmed and this case is remanded to the trial court for the entry and enforcement of the appropriate decree. Costs are adjudged against defendant.

HARBISON, C.J., and COOPER, DROWOTA and O'BRIEN, JJ., concur.