# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 16, 2011 Session

## STATE OF TENNESSEE v. BRETT JOSEPH PRICE

**Appeal from the Circuit Court for Montgomery County**
**No. 40900430      Michael R. Jones, Judge**

---

**No. M2012-02505-CCA-RM-CD - Filed March 14, 2013**

---

This case has been remanded by the Tennessee Supreme Court for reconsideration of sentencing in light of State v. Caudle, 388 S.W.3d 273 (Tenn. 2012). On direct appeal, this court concluded that the Defendant waived review of his sentence by failing to include a transcript of the guilty plea hearing. In light of Caudle, we conclude that the record, which contains transcripts of the motion to suppress hearing and the sentencing hearing, exhibits from each hearing, and the presentence report, is sufficient to determine whether the trial court recited a proper basis for the sentence. 388 S.W.3d 273. The Defendant, Brett Joseph Price, pleaded guilty to robbery, a Class C felony, and conspiracy to commit robbery, a Class D felony. See T.C.A. §§ 39-13-401, 39-12-103 (2010). He was sentenced as a Range I, standard offender to five years for robbery and to three years for conspiracy, to be served concurrently. On appeal, he contends that the trial court erred by (1) denying his motion to suppress his post-arrest statements and by admitting his statement at the sentencing hearing; (2) denying judicial diversion; (3) imposing excessive sentences; and (4) denying probation. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and DONALD P. HARRIS, SP. J., joined.

John E. Herbison (on appeal) and Carrie Watson Gasaway (at trial), Clarksville, Tennessee, for the appellant, Brett Joseph Price.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Robert Joseph Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to a robbery during which Anthony Wilson was injured and George Dyess was shot and killed. The record on appeal does not contain a transcript of the guilty plea hearing, but the record reflects that the Defendant entered his guilty pleas on May 17, 2010. An additional charge of felony murder was retired for one year, conditioned on the Defendant cooperating with the State's prosecution of two additional persons involved with the offenses.

Before entering his guilty pleas, the Defendant moved to suppress his pretrial statements on the grounds that the police failed to inform him of his <u>Miranda</u> rights before he spoke with the police at his home and that any statement given after he was read his rights was the result of the original unwarned statement. At the hearing on the motion to suppress, Clarksville Police Officer Arthur McCray testified that on January 8, 2009, he responded to a crime scene at Marla Circle. He said the Defendant's stepfather came to the scene and informed the police that the Defendant wanted to speak with a detective. He said that he was instructed to go to the Defendant's home and transport the Defendant to the police station and that he followed the Defendant's stepfather to their home. Two other officers also came to the Defendant's home.

Officer McCray testified that the Defendant's stepfather invited him into the home and that the Defendant was in the living room when he arrived. The Defendant appeared to be nervous. He said that he could not remember exactly what he said to the Defendant but that he believed he told the Defendant, "[Y]ou have something to say about what happened to Marla Circle . . . our detectives want to speak with you also, and I am here to transport you to them." He said that neither he nor the other officers asked the Defendant a question but that the Defendant started explaining what happened at the scene. He said that he did not ask the Defendant any followup questions and that he was in the Defendant's home for ten minutes at most before he drove the Defendant to the police station. He said the Defendant was not handcuffed, that he was never asked to leave the Defendant's home, and that the Defendant's parents followed him to the police station. The Defendant did not appear to be intoxicated.

On cross-examination, Officer McCray agreed that he was sent to the Defendant's home to bring the Defendant to the police station to speak with detectives. He agreed that the Defendant was nervous and distraught and that he told the Defendant something similar to, "I heard that you have something to say about what happened on Marla Circle." He agreed he did not advise the Defendant or the Defendant's parents of the Defendant's right to remain silent but said he did not question the Defendant "about anything." He said he did not hear anyone advise the Defendant of his rights. He said he spent ten minutes in the home

-2-

because the Defendant began telling him what happened before he could take the Defendant to the police station. He agreed the Defendant was not free to leave the home. He did not remember the Defendant saying anything on the way to the police station. He did not know if the Defendant's statement was recorded, but he did not have recording equipment with him that night. He agreed he knew the Defendant was a teenager.

Clarksville Police Officer Scott Thompson testified that he followed Officer McCray to the Defendant's home and that Officer McCray was instructed to bring the Defendant to the police station to speak with a detective. They were invited into the home by the Defendant's stepfather, and the Defendant and his mother were present. He said he stood about ten feet from the Defendant and Officer McCray because his purpose for being at the house was to ensure Officer McCray's safety. He heard Officer McCray tell the Defendant that the Defendant needed to come with Officer McCray to speak with a detective about an incident that occurred earlier that evening. Officer Thompson said he did not ask the Defendant a question and did not hear Officer McCray ask the Defendant any questions. He heard the Defendant repeatedly ask if the victim was "ok." He said that the Defendant was solemn and nervous and that they remained in the home for ten minutes or less before leaving.

On cross-examination, Officer Thompson testified that Officer McCray did not ask the Defendant any questions but agreed that a statement such as, "I hear you might have something to say about what happened on Marla Circle," could potentially elicit a response from a suspect. He did not remember if Officer McCray made such a statement. He said Officer McCray explained to the Defendant that the Defendant needed to speak with a detective. He did not hear anyone advise the Defendant of his right to remain silent. He agreed that the Defendant was not free to leave and that he, Officer McCray, and a sheriff's deputy went to the home to transport the Defendant to the police station for questioning. He said he did not think the Defendant was handcuffed before being placed into the patrol car.

Officer Thompson testified that he did not originally recognize the Defendant's name when he was subpoenaed to testify and that he spoke with an investigator to refresh his memory of the Defendant. He said that he and the investigator did not discuss "the importance" of showing that the Defendant was not questioned at the home but that the investigator mentioned the "crux" of the hearing would involve whether the Defendant was questioned. He agreed that the Defendant was nervous while in the home and that he knew the Defendant was a teenager.

Montgomery County Sheriff's Deputy Charles Hummel testified that he followed Officer McCray and Officer Thompson to the Defendant's home. He said that they remained there for eight to ten minutes and that the Defendant's mother, stepfather, and brother were

present. He said that neither he nor the other officers questioned the Defendant but that he could not hear exactly what Officer McCray or the Defendant said. He said that he heard Officer McCray ask the Defendant what his name was and that the Defendant was upset and repeatedly asked if the victim would be "ok." He said the Defendant was not handcuffed before being put in Officer McCray's police cruiser.

On cross-examination, Deputy Hummel agreed that he would not have immediately left the home had he been asked to do so. He said that the Defendant was not detained while in the house but that the Defendant was escorted to the police car by Officer McCray. He agreed he previously testified at a juvenile court hearing that he thought that the Defendant was being detained for questioning and that the officers planned to take the Defendant to speak with an investigator at the police station. He said the Defendant was detained once they left the house.

Deputy Hummel agreed that the Defendant was upset and that he did not hear everything said between the Defendant and Officer McCray. He agreed that it was possible that Officer McCray asked a question that he could not hear and that it was possible to make a statement designed to elicit a response from a suspect. He said Officer McCray was involved in a conversation with the Defendant and the Defendant's parents. He did not hear anyone advise the Defendant of his right to remain silent. He agreed that he and the other officers wore their uniforms while in the home, including their weapons, and that he and Officer Thompson stood between the Defendant and the door to the home. He agreed he knew the Defendant was young.

Clarksville Police Detective Timothy Anderson testified that he spoke with the Defendant at the police station and that the Defendant arrived around 12:30 a.m. with his family and Officer McCray. He did not know if the Defendant was handcuffed. He said the Defendant was placed in an interview room for about five minutes before his mother came to the room. He said that the Defendant was alone in the room during that time and that no questions were asked. He said that when he entered the room with the Defendant's mother, the Defendant asked if the victim was "ok."

Detective Anderson testified that the first thing he did upon entering the interview room was place a written copy of the Miranda rights and a waiver in front of the Defendant and his mother. He said he read the form to the Defendant. He said that the Defendant stated he understood the rights and that the Defendant and his mother signed a waiver of those rights. He said that he watched the Defendant and his mother sign the waiver and that neither of them indicated they did not understand the document. He said the waiver was signed at 12:47 a.m. He said he then asked the Defendant to explain "what it was that he wanted us to know" about the shooting. He said the Defendant explained that he encountered the victim

drug dealer in court earlier that morning, that he got in touch with two other persons about robbing the victim during a drug deal, that he arranged for the drug deal to occur in a house that he and his family recently vacated, that they robbed the victim in the house, that the victim's friend came into the house during the robbery, and that one of the persons with the Defendant shot the victim's friend. Detective Anderson said the Defendant's mother filled out an interview form and provided her contact information while the Defendant told him what happened. He said that the Defendant's mother was upset after hearing the Defendant's statement and that she left the room, but later returned.

Detective Anderson testified that he asked the Defendant to write a statement and the Defendant did so. He said he left the room but did not know if the Defendant's mother was in the room while the Defendant wrote and signed the statement. He said the Defendant took "a while" to write the statement. He identified the statement and said that it was written at 1:15 a.m. and that the Defendant signed it. He said that after the Defendant completed the statement, he advised the Defendant and his parents that the Defendant would be charged.

On cross-examination, Detective Anderson testified that the Defendant was not free to leave when the officers came to his home. He said he was unsure but thought the Defendant was in handcuffs when he arrived at the police station. He said he spoke briefly with Officer McCray when they arrived and was told the Defendant made a statement at the Defendant's home. He said he asked Officer McCray to write down what the Defendant said. He agreed that he spent about five minutes explaining the Miranda rights and the waiver to the Defendant and that this was the same amount of time he spent explaining the rights to adult suspects. He said he did not tell the Defendant that previous statements not preceded by Miranda warnings would not be admissible against him.

Detective Anderson testified that he thought the Defendant's mother filled out the interview form while the Defendant explained what happened. He agreed there was not a clock in the interview room and said he looked at his cell phone and told the Defendant the time to write on the rights and waiver form. He said he did not tell the Defendant's mother the time to write on the interview form she completed. He agreed the rights and waiver form and the interview form had the same time written on them. He said the Defendant's mother must have seen the time noted on the waiver and written the same time on the interview form. He denied that the interview form was filled out before the waiver and said the first thing he did in the interview room was explain the Defendant's rights and have him sign the waiver. He agreed that he previously testified at a hearing in juvenile court that the Defendant's mother filled out the interview form with contact information before he advised the Defendant of his Miranda rights and obtained a waiver. He agreed he said earlier that he thought the Defendant's mother filled out the form while the Defendant explained what

happened, but he denied that he elicited information from the Defendant before obtaining the waiver.

Regina Weedon, the Defendant's mother, testified for the defense that her husband drove to Marla Circle on January 8, 2009, after the Defendant told them that someone was hurt there. She was present when three uniformed officers came to her home. She said Officer McCray approached the Defendant and stated that "he knew what happened over on Marla Circle and that all [the Defendant] needed to do was tell him his side of the story." She said the Defendant asked if the victim was "ok" and then told Officer McCray what happened. She said Officer McCray then stated he needed to take the Defendant to speak with detectives at the police station. She said no one advised the Defendant of his right to remain silent.

Ms. Weedon testified that she and her husband followed the officers to the police station. She said that she met Detective Anderson when she arrived, that he asked her to tell him what the Defendant had told her, and that she did so. She said they went into an interrogation room where the Defendant was waiting. She said that the room was small and that although she initially attempted to sit next to the Defendant, Detective Anderson told her to move to the other side of the table. She said Detective Anderson then began questioning the Defendant. She said the questioning began before Detective Anderson informed the Defendant of his rights. She said Detective Anderson never told the Defendant that any previous statements not preceded by Miranda warnings would be inadmissible. She said Detective Anderson had her and the Defendant sign forms after the Defendant explained what happened.

Ms. Weedon was shown an interview form and testified that she thought it was her handwriting on the page. She said that she did not read the form but that Detective Anderson read it to her. She said Detective Anderson began questioning the Defendant "way before" she began filling out the interview form. She agreed that the waiver form and the interview form had the same time written on them: 12:47 a.m. She said she thought Detective Anderson wrote the time on the rights and waiver form. She said she wrote the time on the interview form. She said that there was not a clock in the interview room and that Detective Anderson provided the time. She said she was not present when the Defendant wrote his statement because Detective Anderson asked her to leave the room. She agreed that the Defendant was in juvenile court on the morning of the robbery for fighting in school.

On cross-examination, Ms. Weedon agreed that her husband went to the scene for the purpose of having the police speak with the Defendant. She agreed the Defendant told the officers what he wanted to tell them about the robbery. She did not see the officers place handcuffs on the Defendant. She agreed that she signed the waiver form but that she did not

remember the form being executed. She said that although Detective Anderson read part of the rights and waiver form to the Defendant, he never stated that the Defendant had the right to remain silent. She said Detective Anderson had his hand over the waiver when she signed it. She agreed she thought Detective Anderson wrote "12:47" on the waiver. She agreed she filled out the interview form, including the time noted on the form. She did not remember the time being written on the rights and waiver form when she signed it and agreed the time was added to the document after she signed it. She agreed that she did not know the time when she filled out the interview form and that she wrote the time on the form after Detective Anderson looked at his cell phone and told her what time it was.

On redirect examination, Ms. Weedon testified that before her husband went to the scene, they did not discuss whether the Defendant would give a statement to the police. She said her husband went to the scene not to have the police obtain a statement from the Defendant, but rather to ensure that the victim received help.

The trial court denied the motion to suppress. The trial court found that although the Defendant was in custody when he spoke with a police officer at his home, Miranda warnings were not required at the time because the Defendant's statements were not the result of interrogation. The trial court found that Officer McCray did not ask a question, that he had no way of knowing his statement to the Defendant, that he "heard that [the Defendant] had something to say about what happened . . . our Detectives want to speak with you . . . and I am here to transport you to them," was likely to evoke an incriminating statement, and that the Defendant's response was unforeseen. The trial court also found that all subsequent statements made by the Defendant occurred after he was advised of his Miranda rights. The Defendant pleaded guilty to robbery and conspiracy to commit robbery.

At the sentencing hearing, the State introduced the presentence report. The report states that on January 8, 2009, the Defendant, Terry Smith, and Craig Fulton, Jr., agreed to rob Anthony Wilson during a drug deal. The Defendant brought Mr. Wilson into his home under the pretense that he would buy marijuana from Mr. Wilson, while George Dyess, Mr. Wilson's friend, remained outside. The Defendant, Mr. Smith, and Mr. Fulton beat Mr. Wilson and took the marijuana from him. During the robbery, Mr. Dyess came into the home to help Mr. Wilson. Mr. Dyess was shot several times and died as a result of his injuries.

Jenita Louise Taylor testified that Mr. Dyess was her son and that they had a close relationship. She said Mr. Dyess had two young children who would not have the chance to know their father. Willie Ray Taylor testified that Mr. Dyess was his son. He said Mr. Dyess's death traumatized their entire family. Jessica Dyess testified that Mr. Dyess was her brother and that his death tore apart their family.

Detective Anderson testified that he investigated the Defendant's case. He identified a statement written by the Defendant on January 9, 2009, and said the Defendant informed the police that Mr. Smith and Mr. Fulton were involved in the robbery and murder. The signed statement said:

> When I was in court today A.J. came up to me and said he was getting 2 ounces he said if I needed anything to call him but I told him to take my number and I told him it was 378-1453 so he called a little bit after I got out of school and said if I needed anything to hit him up so I called Terry Smith and asked him if he wanted to hit a lick he said yes [and] Craig Fulton was with him. I told him about what A.J. said so he 3 wayed him to find out if it was the truth after he found out he came over and picked me up from 1811 Hiltopp Rd and drove me down below 3844 Marta circle in a dead end and we seen that A.J. was there so I called him and told him that he needed to meet me at the [BP]. I seen him leave then we made [our] way inside the house then I called him back and told him my home boy dropped me off so it was just me and him in the house. He came back to the house I met him outside [where] him and his friend was coming in and I told him I don't like strangers up in my house. He said ok that cool so we went inside and I asked him where the quarter [and] the half was he said right here and pulled them out with a scale to weigh it after I weighed it I yelled out its straight and Terry Smith and Craig Fulton both came out and we robbed him and his boy kicked the door in and I dunno if he had a gun in his hand or what but Terry Smith shot him. Terry Smith was the only one with a gun out of me [and] Craig Fulton. Terry shot A.J.'s friend and both of them ran to the car and drove somewhere. I stayed locked my doors and ran to hop the fence and tried to catch up with Terry [and] Craig but their car was already down the road. So I took off running and got a ride home.

On cross-examination, Detective Anderson agreed that the Defendant's stepfather came to the scene after the shooting to check on Mr. Dyess and that the Defendant asked his stepfather to do so. He agreed the Defendant's stepfather led the police back to his home, where the Defendant was waiting. He agreed the Defendant was cooperative and told the police what happened. He said that as far he knew, the Defendant was truthful with the police. He said that the police had only a vague description of the other persons involved with the robbery and shooting and that it would have been very difficult to develop suspects without the Defendant's cooperation. He agreed that the Defendant intended to cooperate with the prosecution of Mr. Smith and Mr. Fulton and that it would be very difficult to prosecute them without the Defendant's cooperation.

Regina Weedon testified that she was the Defendant's mother. She said that he completed the eighth grade while in jail and that he continued his education after he was released from custody pending the sentencing hearing. She identified the Defendant's home-school education records and said that the Defendant took his education seriously and that his cumulative grade point average was 93.57. She said that the Defendant was fifteen years old when he was released from jail and that he performed yard work and painting for family friends after being released because he was too young to find employment.

Ms. Weedon testified that she had a large family and that they supervised the Defendant continuously after he was released. She said that the Defendant had a more mature outlook and that he wanted to resume attending public school. She asked the trial court to grant judicial diversion.

On cross-examination, Ms. Weedon agreed that the Defendant did not do well in public school and had confrontations with others. She agreed that some of the confrontations resulted in charges in juvenile court and that the Defendant was also charged with assaulting her husband. She did not know that the Defendant received diversion on those charges but said she would not dispute records noting that he received diversion. She agreed that the changes she saw in the Defendant occurred after the crime in this case and after he was jailed.

Ms. Weedon testified that the grades the Defendant earned while in jail and after being released were better than those he received in public school. She agreed that many of the Defendant's problems developed from being in a public school environment and associating with the other students. She said she was committed to educating the Defendant at home.

On redirect examination, Ms. Weedon agreed that in the summer of 2008, the Defendant visited his biological father, who told the Defendant that "he never wanted him in the first place, that he wished [the Defendant's mother] had aborted him[.]" She said that the Defendant was angry when he returned home and that the Defendant's assault charges occurred after he visited his father. She agreed that the Defendant was "tremendously affected" by the crimes in this case, even before being jailed, and she did not think he needed further confinement.

The Defendant testified that he was sorry for what he did and that he did not intend for anyone to be harmed. He said that he did everything possible to help Mr. Dyess and that he would help the State prosecute the person who killed Mr. Dyess. He apologized to the victim's family.

The trial court noted its consideration of the evidence received at previous hearings and the sentencing hearing and its consideration of the Defendant's statement to the police that was introduced at the sentencing hearing. In denying judicial diversion, the trial court stated that it was unable to determine whether the Defendant was amenable to correction but found that the circumstances of the offense, the Defendant's social history, and the deterrence value to the Defendant and others outweighed any factors in favor of granting diversion. The court found that the Defendant planned the robbery and that diversion would not serve the interests of justice.

The trial court found that enhancement factor (2) was applicable because the Defendant planned the robbery and convinced the victims to come to the home where the crimes occurred. See T.C.A. § 40-35-114(2) (2010) ("The defendant was a leader in the commission of an offense involving two (2) or more criminal actors."). The trial court found that factor (12) applied because the actions of the Defendant resulted in the death of Mr. Dyess. See id., § 40-35-114(12) ("During the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of, or serious bodily injury to, a victim or a person other than the intended victim."). The trial court found that mitigating factors (9) and (13) applied because the Defendant assisted the police in apprehending the other persons involved with the crimes, stayed out of trouble after being released from jail, and furthered his education. See id., § 40-35-113(9) ("The defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses."); § 40-35-113(13) ("Any other factor consistent with the purposes of this chapter."). The trial court sentenced the Defendant as a Range I, standard offender to five years' confinement for robbery and to three years' confinement for conspiracy, to be served concurrently. This appeal followed.

**I**

The Defendant contends that the trial court erred in considering his statements to police at his home and in writing at the police station because the officers failed to give "appropriate" Miranda warnings. The Defendant argues that his statements in his home were in response to "the functional equivalent of interrogation." He also argues that his mother completed the admonition and waiver while Detective Anderson was questioning him, not before the questioning began, in violation of Miranda. He argues that if a proper waiver was completed, the statements he made at the police station were still improper as fruits of his earlier statements made at his home without Miranda warnings. The State initially contends that the Defendant has waived consideration of whether the trial court erred in considering his statements during sentencing because the voluntary and informed entry of a guilty plea

-10-

waives all non-jurisdictional defects and constitutional irregularities which may have existed prior to the entry of the guilty plea. In the alternative, the State contends that the Defendant's statements made to police in his home are not before this court because they were not used at the sentencing hearing and that the trial court properly denied the suppression of the Defendant's statements to Detective Anderson.

The Rules of Criminal Procedure and Appellate Procedure allow an appeal from a guilty plea under very narrow circumstances. See Tenn. R. Crim. P. 37(b)(2); T.R.A.P. 3 (b). Under these provisions, an appeal lies from a guilty plea if: (1) at the time the defendant entered a guilty plea, he or she explicitly reserved the right to appeal a certified question of law that was dispositive of the case pursuant to and in compliance with the requirements of Rule 37(b)(2); (2) the defendant seeks review of the sentence and there was no plea agreement concerning the sentence; or (3) the errors complained of were not waived as a matter of law by the guilty or nolo contendere plea, or otherwise waived, and such errors are apparent from the record of the earlier proceedings. Here, the Defendant entered a guilty plea and did not explicitly reserve a certified question concerning his motion to suppress.

The Defendant contends that his appeal is from the sentences imposed but that there is a substantial issue as to whether the trial court erred in admitting his statements at the sentencing hearing. The trial court denied the Defendant's pretrial motion to suppress the Defendant's statements, and the Defendant did not preserve a certified question challenging the court's decision. The Defendant cannot rely on his pretrial motion to suppress to preserve his objection because he subsequently pleaded guilty and waived all evidentiary issues for purposes of determining his guilt. See State v. Brobeck, 751 S.W.2d 828, 833-34 (Tenn. 1988); State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). We also note that the Defendant failed to object to the admission of his statement at the sentencing hearing and waived any issues concerning the admission of that evidence at the hearing. See T.R.A.P. 36(a); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

**II**

The Defendant contends that the trial court erred in denying judicial diversion. He argues that the court's findings as to judicial diversion were "generic and speculative" and not based on the record. The State contends that the trial court properly denied judicial diversion. We agree with the State.

A defendant is eligible for judicial diversion if he or she is found guilty of or pleads guilty or nolo contendere to a Class C, D, or E felony or a lesser crime, has not previously been convicted of a felony or a Class A misdemeanor, and is not seeking deferral for a sexual offense. See T.C.A. § 40-35-313(a)(1)(B)(i) (2010). The decision to grant judicial diversion

lies within the sound discretion of the trial court, and this court will not disturb that decision on appeal absent an abuse of discretion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Upon review, we will give the trial court the benefit of its discretion "if 'any substantial evidence to support the refusal' exists in the record." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983)).

In determining whether to grant judicial diversion, the trial court must consider (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the ends of justice. Electroplating, 990 S.W.2d at 229; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In addition, "the record must reflect that the court has weighed all of the factors in reaching its determination." Electroplating, 990 S.W.2d at 229. If the trial court refused to grant judicial diversion, it should state in the record "the specific reasons for its determinations." Parker, 932 S.W.2d at 958-59.

Regarding the Defendant's amenability to correction, the court found that although it was impossible to determine if the Defendant was amenable to correction because of his young age, his actions in the time he was released after serving over one year in jail suggested he was amenable to correction or showed "fear of what the Court may do." The court found that the circumstances of the offense were "very much against the grant of diversion" because the offense was planned by the Defendant, beginning in juvenile court and ending with the death of a victim. In considering the Defendant's criminal record, the court found that this was the Defendant's first "adult venture in the Court" but that he did have a juvenile history, which the court considered in the Defendant's social history. The court found that the Defendant's physical and mental assessment were factors in his favor. The court determined that granting diversion would not act as a deterrent to others, which weighed against judicial diversion. The trial court also found that judicial diversion would not serve the ends of justice "under any means" because the Defendant "at the early age of fourteen" planned to "hit a lick" and take someone's property by force.

Although the Defendant had no adult criminal history, had good physical and mental health, and had family support, the trial court denied judicial diversion after finding that the circumstances of the offense, the Defendant's social history, the deterrence value to the Defendant and others, and the interests of the public weighed against granting diversion. The record reflects the court weighed the required factors in determining whether to grant judicial diversion and made findings that were supported by the record. We conclude that substantial evidence exists for the court's denying judicial diversion. The Defendant is not entitled to relief.

-12-

## III

The Defendant contends that his sentences are excessive. He challenges the applicability of enhancement factor (12), regarding infliction of severe bodily injury, and argues that the trial court erred in failing to apply mitigating factors for the Defendant's remorse, lack of a criminal record, family support, and work ethic. The State contends that the court properly sentenced the Defendant to a term of incarceration within the applicable sentencing range. The Range I punishment for robbery is from three to six years and for conspiracy to commit robbery is from two to four years. See T.C.A. § 40-35-112(a)(3), (4). The trial court applied two enhancement factors and two mitigating factors and sentenced the Defendant to five years for robbery and three years for conspiracy.

In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2010); see Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236. Appellate review of sentencing is for abuse of discretion. Bise, 380 S.W.3d at 707. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id.

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. Id. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id.

The trial court noted its consideration of the Defendant's statement, the presentence report, the principles of sentencing and arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors, and the statistical information provided by the administrative office of the courts. In enhancing the Defendant's sentences, the trial court found that enhancement factor (2), regarding being a leader in the commission

of an offense, applied because the Defendant "set it all up, enticed these other people to come hit a lick with him. Got them to meet him in the house so all of this could be carried out, in the house where his family had lived previously." The court determined that factor (2) was "the real strong matter for the Court." The record supports the finding that the Defendant was the leader in the commission of the robbery.

The trial court also applied factor (12), finding that the actions of the Defendant resulted in the death of a victim. The Defendant argues that the court's repeated references to the victim's death "suggest an undercurrent in the record that the Defendant is being punished for the felony murder alleged in Count One of the indictment." He argues that Count One was retired and that consideration of the death of the victim was unjust when the State had a right to a jury trial on the charge and when the Defendant pleaded only to robbery and conspiracy to commit robbery. The court is required to consider evidence received at the sentencing hearing, and the Defendant's statement, which was received at the sentencing hearing, admits that he robbed one victim and that another victim was shot and killed during the robbery. T.C.A. § 40-35-210(b)(1); See Ashby, 823 S.W.2d at 168. The court is not required to ignore the evidence proving a more serious offense than the offense to which the Defendant pleaded guilty. See State v. Danny Horn, No. 01C01-9606-CC-00256, slip op. at 5 (Tenn. Crim. App. Nov. 20, 1997) (noting that these circumstances may justify the denial of an alternative sentence). The record supports the application of factor (12).

Under our Sentencing Act, enhancement factors may be applied if they are "appropriate for the offense" and "not already an essential element of the offense." T.C.A. § 40-35-114 (2010). "[E]nhancement factors may not be applied if they are based on facts that are used to prove the offense." State v. Arnett, 49 S.W.3d 250, 263 (Tenn. 2001). Here, the Defendant pleaded guilty to charges of robbery and conspiracy to commit robbery. The offense of robbery required the State to prove that the Defendant intentionally or knowingly took the property of another by violence or putting the person in fear. See T.C.A. § 39-13-401(a) (2010). The State may prove violence or fear by something less than the death or serious bodily injury of the victim. See id. §§ 39-13-401(a); 40-35-114(12). Therefore, factor (12) is applicable to the Defendant's convictions because his planning and participating in the robbery resulted in his accomplice shooting and killing a person other than the intended victim. See State v. Carter, 986 S.W.2d 596, 598 (Tenn. Crim. App. 1998). We agree that the Defendant was a leader in the commission of the offense and that the Defendant's actions resulted in the death of someone other than the victim. The court also emphasized that the severity of these offenses should not be depreciated and that confinement would serve as a more effective deterrent.

With regard to mitigating factors, the trial court found mitigating factors (9) and (13) applicable. See T.C.A. § 40-35-113 (9), (13) (2010). The court found that the Defendant

assisted authorities in apprehending others who committed the offenses by the statement he made to police. In support of factor (13), the court found that the Defendant entered a plea, stayed out of trouble since his release, and continued his education. The Defendant argues that the court should have considered family support, continued education, and remorse as mitigating factors. During the court's consideration of factor (13), it found that the Defendant continued his education while released on bond.

Under T.C.A. § 40-35-113(13), family contribution is entitled to favorable consideration as a mitigating factor, and genuine, sincere remorse is a proper mitigating factor. *See State v. Martin*, 146 S.W.3d 64, 70 (Tenn. Crim. App. 2004); *State v. Williamson*, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995). The record reflects that the Defendant's family supported him while he was on bond, that they allowed him to perform tasks around their houses because he was too young to seek regular employment, and that his mother had no issues with him while she supervised him. The court noted at the sentencing hearing in its oral findings that the Defendant had remorse, but his remorse was not considered during the court's discussion of factor (13). We conclude that although the trial court should have considered the Defendant's family support and his remorse as additional support for mitigating factor (13), the additional support does not show that the trial court abused its discretion in sentencing the Defendant. Bise, 380 S.W.3d at 706. ("[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005.").

Although the trial court found that two enhancement factors and two mitigating factors applied, the court placed great weight on enhancement factor (2), and we will not reweigh its application of the enhancement and mitigating factors. See Carter, 254 S.W.3d at 345 (holding that an appellate court may not reweigh enhancement and mitigating factors applied by the trial court). We conclude that the record justifies the imposition of the within-range sentences and that the trial court did not abuse its discretion.

**IV**

The Defendant contends that the trial court did not give consideration to the factors favoring probation. He argues that he cooperated with police, was remorseful, had strong family support, continued his education while in jail pending trial, and was amenable to correction or rehabilitation and that the court gave "short shrift" to these factors. The State contends that the Defendant did not meet his burden of establishing he was a favorable candidate for probation and that the court properly denied the Defendant's request for probation. We agree with the State.

-15-

The Tennessee Supreme Court recently adopted a new standard of review for sentencing in State v. Bise, 380 S.W.3d 682 (Tenn. 2012). In Bise, the court held that length of sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" Id. at 708. More recently, our supreme court has applied the abuse of discretion standard with a presumption of reasonableness to "questions related to probation or any other alternative sentences." Caudle, 388 S.W.3d at 278-79.

The Defendant is eligible for probation because his sentences are under ten years and because his offenses are not among those excluded from consideration for probation. See T.C.A. § 40-35-303(a) (2010). Absent evidence to the contrary, he should be considered a favorable candidate for alternative sentencing because he is a standard offender convicted of a Class C felony and a Class D felony. See T.C.A. § 40-35-102(6) (2010) (stating that an eligible defendant who is "an especially mitigated or standard offender convicted of a Class C, D or E felony should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary"); see also State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). However, mere eligibility does not automatically entitle a defendant to probation. See State v. Fletcher, 805 S.W.2d 785, 787 (Tenn. Crim. App. 1991); State v. Beverly Dixon, No. W2004-00194-CCA-R3-CD, slip op. at 10 (Tenn. Crim. App. June 30, 2005) (citing State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998)). The burden is on the defendant to establish that he is suitable for probation and "that probation [would] be in the best interest of the defendant and the public." State v. Ring, 56 S.W.3d 577, 586 (Tenn. Crim. App. 2001) (citing State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997)). Furthermore, the statutory provisions regarding alternative sentences must be read together with the Sentencing Act as a whole. See Fletcher, 805 S.W.2d at 787-88; State v. Wagner, 753 S.W.2d 145, 147 (Tenn. Crim. App. 1988).

When determining if incarceration is appropriate, a trial court should consider if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1) (2010); see also State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).

-16-

After concluding that judicial diversion was not appropriate for the Defendant, the trial court said the much more difficult decision was what to do "with a fifteen year old who commits such terrible acts." The court concluded that the Defendant would serve his sentences in custody. At the sentencing hearing, the court found that further confinement was necessary to avoid depreciating the serious nature of the offenses. The record reflects that the Defendant, fourteen years old at the time of the incident, began planning a robbery while already under the supervision of the juvenile court, recruited others to help, and admittedly committed a robbery where one of his accomplices shot and killed a man. We agree with the trial court that the facts underlying the robbery were serious. The court denied alternative sentencing based on the nature of the offense and to avoid depreciating the seriousness of the offense. The Defendant has not established that the trial court abused its discretion by denying probation. Although we note the court also found that confinement was necessary to deter others because the court's district had a problem with violence and weapons, we note that reliance on the need for deterrence is not appropriate absent proof that the district had such a problem. Hooper, 29 S.W.3d at 9 (stating that "the record must contain some proof of the need for deterrence before a defendant, who is otherwise eligible for probation or other alternative sentence, may be incarcerated"). In any event, the Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE